Charles E. Dorkey III
Christopher M. Caparelli
TORYS LLP
237 Park Avenue
New York, New York 10017
(212) 880-6000
Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x
VANESSA M. PUGLIESE,

                Plaintiff,

        - against –

VERIZON NEW YORK, INC.; and/or VERIZON,

                Defendant.
------------------------------------------------------------------- x

Index No.: 05 Civ. 4005 (CM)

DEFENDANT'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Defendant submits this statement, pursuant to Rule 56.1 of the Local Rules of the Southern District of New York, in support of its motion for summary judgment on plaintiff's claims.

There is no genuine issue to be tried as to the following material facts:

A.    <u>The Parties</u>.

    1.    Plaintiff Vanessa M. Pugliese ("Pugliese") is a 32-year old woman. (Ex. 1: Pugliese 3/9/06 Tr. at 15.)[1]

---

[1] The exhibits referred to herein are annexed to the accompanying declaration of Charles E. Dorkey III.

2.      Defendant Verizon New York Inc. ("Verizon") is Pugliese's former employer. (Ex. 3: Compl. ¶ 1; Declaration of Lawrence A. Iazzetti, executed January 11, 2007 ("Iazzetti Decl."), ¶¶ 1, 3.)

B.      Pugliese's Employment at Verizon.

3.      Pugliese applied for a position as a Field Technician at Verizon's predecessor, NYNEX, and was hired in August 1997. (Ex. 1: Pugliese 3/9/06 Tr. at 30-32.)

4.      Pugliese's father had worked as a Field Technician at Verizon's predecessors for 25 years. (Ex. 1: Pugliese 3/9/06 Tr. at 28-29.)

5.      The job description for a Field Technician states that such an employee's duties include, among other things, the following tasks:

- Repair[s] wiring and associated items of equipment at customer's premises.
- Interacts with customers to ensure customer satisfaction.
- Checks work to ensure it meets all customer requirements.
- Completes and signs a daily time record [written or electronic].
- Works indoors and outdoors in all kind of weather.
- Climbs ladders or poles and works aloft for long periods of time using tools and test equipment.

(Ex. 4 at 0015-16; Iazzetti Decl. ¶ 4.)

6.      In August 1997, Pugliese spent six weeks in training to learn the essential functions of a Field Technician position: telecommunications cable installation, pole climbing and repair. (Ex. 1: Pugliese 3/9/06 Tr. at 30-32; see also Ex. 4.) Pugliese understood that these

2

were essential functions of her position as a Field Technician.  (Ex. 1:  Pugliese 3/9/06 Tr. at 42-43.)

7.   All Field Technicians in Westchester and Rockland Counties work alone, except on special occasional tasks that require multiple workers, or if a worker needs temporary assistance for medical reasons unrelated to the job tasks.  (Ex. 1:  Pugliese 3/9/06 Tr. at 57; Ex. 6: Lehane Tr. at 9, 14; Iazzetti Decl. ¶ 5.)

8.   Pugliese began working as a Field Technician in October 1997 based out of the Verizon's garage located at 545 Saw Mill River Road, Elmsford, New York, which is located in Westchester County.  (Ex. 1:  Pugliese 3/9/06 Tr. at 34.)

9.   Throughout her tenure at Verizon, Pugliese typically worked a shift from 7:30 a.m. to 4:30 p.m.  (Ex. 1:  Pugliese 3/9/06 Tr. at 44, 66.)

10.  As she had understood from the job description for a Field Technician and her six-week training course, Pugliese's job entailed climbing telephone poles, running wire inside and outside of buildings, and installing and repairing telephone lines inside and outside of buildings.  (Ex. 1:  Pugliese 3/9/06 Tr. at 42-43.)

11.  Throughout her tenure as Field Technician at Verizon, however, Pugliese, by her own admission, did not satisfactorily perform her job duties.  (Ex. 1:  Pugliese 3/9/06 Tr. at 43-47, 66-68, 72-73.)

12.  At the beginning of each day, Pugliese reported to the Elmsford garage to pick up her Verizon truck and work assignments for the day.  (Ex. 1:  Pugliese 3/9/06 Tr. at 40-41.)

3

13.     Pugliese typically received three work assignments, which she understood were intended to take her entire shift to complete.  (Ex. 1:  Pugliese 3/9/06 Tr. at 40, 46-47.)

14.     Pugliese instead hurried through her three assignments and typically completed them by Noon.  (Ex. 1:  Pugliese 3/9/06 at 43-46.)

15.     Pugliese admittedly did not complete all aspects of her assignments.  For example, when Pugliese was assigned to bring dial tone to a home and the customer was not present, Pugliese would simply guess to which jack the customer wanted the new phone to run and she failed to contact the customer to assure that the work was completed to the customer's satisfaction.  (Ex. 1:  Pugliese 3/9/06 Tr. at 46.)

16.     Moreover, Pugliese understood that if she completed the work assignments given to her in the morning before the end of her shift, Pugliese was required to call the garage or a dispatch unit to obtain additional work assignments.  (Ex. 1:  Pugliese 3/9/06 Tr. at 47-48.)

17.     Pugliese did not call to obtain additional work assignments when she finished her initial assignments before the end of her shift.   (Ex. 1:  Pugliese 3/9/06 Tr. at 48.)

18.     Instead, after hurriedly and incompletely finishing her work assignments, Pugliese would go to a neighboring empty garage and "hang out" until the end of her shift.  (Ex. 1: Pugliese 3/9/06 Tr. at 43-48.)

19.     Pugliese did not inform her supervisors that she spent part of each day in an empty garage without obtaining additional work assignments.  (Ex. 1:  Pugliese 3/9/06 Tr. at 48.)

20.     The Verizon Code of Business Conduct is distributed to each Verizon employee, who is also advised by his or her supervisor to comply with the business conduct standards it contains, to ask for clarification of material that the employee does not understand and to retain a copy of the Code for reference.  Supervisors also advise their employees that violations of the Code of Business Conduct can lead to disciplinary action up to and including dismissal.  (Ex. 5; Iazzetti Decl. ¶ 6.)

21.     Verizon's Code of Business Conduct states that "[e]mployees who violate company standards may be disciplined up to and including dismissal, as well as be subject to civil and criminal charges.  If misconduct occurs, Verizon is committed to taking prompt and responsive action to correct the situation and discipline responsible individuals."  (Ex. 5 at VZN 0013.)

22.     Verizon's Code of Business Conduct requires that employees use company time "productively and effectively" and that they "be on the job when scheduled and follow policies regarding work time."  (Ex. 5 at VZN 0040.)  Verizon employees are not to "allow personal activities to inappropriately affect [their] use of company time."  (Id.)

23.     In 1998, Pugliese became pregnant.  Upon her request, Verizon gave Pugliese a "desk job" making customer call-backs to verify that customers were satisfied. (Ex. 1:  Pugliese 3/9/06 Tr. at 52-53.)

24.     Pugliese also received maternity leave from Verizon for a few months before her son's birth in June 1999 and for approximately five months after his birth.  (Ex. 1:  Pugliese 3/9/06 Tr. at 53-54.)

25. Following Pugliese's maternity leave, she returned to work as a Field Technician based out of the Elmsford garage. (Ex. 1: Pugliese 3/9/06 Tr. at 54.)

26. As had been the case before her maternity leave, Pugliese typically rushed through her assignments to be finished by noon and would then "hide out" in an empty Verizon garage. (Ex. 1: Pugliese 3/9/06 Tr. at 56.)

27. While based out of the Elmsford garage, Pugliese, on occasion, would "just beep somebody, a friend of [hers] and have them come keep [her] company" without notifying a supervisor. (Ex. 1: Pugliese 3/9/06 Tr. 56.) Pugliese also on occasion called her husband, another Verizon employee, to accompany her. (Ex. 1: Pugliese 3/9/06 Tr. at 62.)

28. Verizon's Code of Business Conduct does not permit employees to "ask fellow employees to use their work time for non-business purposes." (Ex. 5 at VZN 0040.)

29. After several years based in Elmsford, Pugliese requested and received a transfer to a garage located in Nanuet, New York, which is located in Rockland County. (Ex. 1: Pugliese 3/9/06 Tr. at 63-64.)

30. While based out of the Nanuet garage, Pugliese continued to hurry through her assignments and finish the jobs "around noon" and then go home to do her laundry or "stay on the last job and hang out in the truck" until the end of her shift. (Ex. 1: Pugliese 3/9/06 Tr. at 66-68.)

31. While based out of the Nanuet garage, Pugliese did not call to obtain additional work assignments when she finished her initial assignments before the end of her shift. (Ex. 1: Pugliese 3/9/06 Tr. at 66-68.)

32. Pugliese did not inform her supervisors in Nanuet that she spent part of each day at home or sitting in her truck without obtaining additional work assignments. (Ex. 1: Pugliese 3/9/06 Tr. at 68.)

33. Within weeks after her transfer to Nanuet, Pugliese requested and received a transfer to a garage located in Pomona, New York, which is located in Rockland County. (Ex. 1: Pugliese 3/9/06 Tr. at 71.)

34. While based out of the Pomona garage, Pugliese continued to rush through her assignments and thereafter would sit in her truck until the end of the shift. (Ex. 1: Pugliese 3/9/06 Tr. at 73.)

35. While based out of the Pomona garage, Pugliese did not call to obtain additional work assignments when she finished her initial assignments before the end of her shift. (Ex. 1: Pugliese 3/9/06 Tr. at 73.)

36. Pugliese did not inform her supervisors in Pomona that she spent part of each day at home or sitting in her truck without obtaining additional work assignments. (Ex. 1: Pugliese 3/9/06 Tr. at 73-74.)

37. In or about 2002, Pugliese requested and received a transfer back to the Elmsford garage. (Ex. 1: Pugliese 3/9/06 Tr. at 79-80.)

38. While again based out of the Elmsford garage, Pugliese hurried through her assignments and was often done by Noon, after which she would either hang out for the rest of her shift in an empty garage or stay in her truck, without calling for additional assignments and without informing her supervisors. (Ex. 1: Pugliese 3/9/06 Tr. at 80.)

39.     Pugliese understood that she was required as a regular practice to fill out a time sheet each day that indicated the work she performed, the phone number for the customer, and the time frame for the work performed.  (Ex. 1:  Pugliese 3/9/06 Tr. at 49-50; Ex. 4 at 0015.)

40.     Pugliese inaccurately reported the time she spent on each job to make it appear that she spent her full work shift performing the jobs she had been assigned in the morning.  (Ex. 1:  Pugliese 3/9/06 Tr. at 49-50.)

41.     Verizon's Code of Business Conduct requires that employees record their time "honestly, carefully, accurately and according to applicable laws".  (Ex. 5 at VZN 0040.)  Verizon makes clear to its employees that "[f]alse time reporting is a serious problem and can even violate certain laws."  (Id.)

42.     In March 2003, Pugliese told her supervisor, Lou Delbene, that she did not "feel safe" and needed a companion.  (Ex. 1:  Pugliese 3/9/06 Tr. at 82-83; Iazzetti Decl. ¶ 7.)

43.     Mr. Delbene agreed to let Pugliese work with another Verizon Field Technician from approximately March 4 through March 24, 2003.  (Ex. 1:  Pugliese 3/9/06 Tr. at 82-83; Ex. 3:  Compl. ¶ 11.)  Delbene told Pugliese at the time that this was a temporary allowance and that she would be required to work alone in the future.  (Ex. 1:  Pugliese 3/9/06 Tr. at 83.)

44.     Verizon gave similar temporary accommodations to individuals with short term physical or mental impairments.  (Ex. 6: Lehane Tr. at 66-67.)

45.     Pugliese admitted under oath that she was never told she held a position of Escort or "escort technician" and that she is not aware that such a position exists in Westchester County.

(Ex. 1: Pugliese 3/9/06 Tr. 96-97, 262-64.) Indeed, Pugliese admitted that she knew of no Verizon employee who had the position of an Escort in Westchester County. (Id. at 262-64.)

46.    There is no position within Verizon known as an "escort technician" in Westchester County or elsewhere. (Iazzetti Decl. ¶ 20.)

47.    On or about March 25, 2003, Lou Delbene was replaced by Clarence Williams as Pugliese's supervisor. (Ex. 1: Pugliese 3/9/06 Tr. at 83; Iazzetti Decl. ¶ 8.)

48.    Mr. Williams told Pugliese that she could no longer ride with another person and must ride alone as her job required. (Ex. 1: Pugliese 3/9/06 Tr. at 83; Ex. 3: Compl. ¶ 11.)

49.    Pugliese was absent from work from March 26 through March 31, 2003. (Ex. 7 at VZN 0163.)

C.    Pugliese Informed Verizon That Should Could Not
       Continue The Essential Functions Of A Field Technician.

50.    On or about March 31, 2003, Pugliese gave a note to her supervisor, Clarence Williams, from Dr. Carol Paras stating that because of Pugliese's "post traumatic stress disorder (delayed)" Pugliese "can no longer work outside, alone" and will "have to be moved inside as soon as possible." Dr. Paras suggested that "as an alternative to her going out on full time disability at this time, you could try sending her out to work with a companion." (Exs. 8, 9; Iazzetti Decl. ¶ 9.)

51.    Dr. Paras later added that Pugliese should work "indoors preferably with other women", (Exs. 10, 11), and that Pugliese needed a job that did not involve "working in highly visible positions", such as high on telephone pole or aloft in the bucket of a Field Technician's

9

truck, "being in people's homes", and "being alone and having physical contact with the public." (Exs. 12, 13.)

52. Because Pugliese informed Verizon that she could no longer work outside and among the public and could no longer climb telephone poles or remain aloft in a bucket truck, she could no longer perform the essential duties of her Field Technician job. (See Ex. 4.) Accordingly, she was sent home. (Ex. 3: Compl. ¶ 12; Ex. 7 at VZN 0166; Ex. 15 at 0011.)

53. At around the same time, Pugliese also telephoned Lawrence Iazzetti, Verizon's Manager, Human Resources Business Partner for the Capital Market Area, and informed him, for the first time, that she was under the care of a psychiatrist who had advised that she should not work outside alone. (Iazzetti Decl. ¶¶ 2, 10.)

D.   Verizon Referred Pugliese's Matter To Its Disability
     Administrator And Offered Her A Job With A Companion.

54. Verizon has an established policy and procedure for attempting to accommodate employees with disabilities. (Iazzetti Decl. ¶ 11.)

55. Pursuant to Verizon's policy, a non-management employee who calls in sick for eight days is referred to Verizon's disability administrator, Metropolitan Life Insurance Company ("MetLife"). MetLife evaluates the employee's medical records and, where necessary, conducts an independent medical examination. (Iazzetti Decl. ¶ 12.)

56. Consistent with its policy and procedures, when Pugliese gave the note from Dr. Paras to her supervisor on or about March 31, 2003, Verizon referred the matter to MetLife. (Iazzetti Decl. ¶ 18.)

10

57.     MetLife approved Pugliese for short term disability benefits making her eligible for 13 weeks of full pay and 39 weeks of half pay benefits. (Iazzetti Decl. ¶ 18) While receiving short term disability benefits, Pugliese remained on Verizon's payroll and continued to receive pay stubs through April 22, 2004. (Ex. 14 (HIC § 5.3(d)) at VZN 0246; Ex. 15 at 0011-12; Exs. 16, 17, 18.)

58.     In September 2003, Verizon offered to accommodate Pugliese by allowing her to transfer to an available position of Escort in the Bronx. (Iazzetti Decl. ¶ 19; Ex. 1: Pugliese 3/9/06 Tr. at 97.) The job of an Escort is to accompany a Field Technician in certain areas of Manhattan, Brooklyn, the Bronx and Queens; the position does not exist outside of New York City and, thus, there are no Escort positions in Westchester or Rockland Counties. (Iazzetti Decl. ¶ 20; Ex. 6: Lehane Tr. at 9; Ex. 15 at 0011; Ex. 19 at 0017.) The wage paid to an Escort is significantly less than the wage paid to a Field Technician.

59.     Pugliese did not accept the Escort position in the Bronx. (Iazzetti Decl. ¶ 21; Ex. 1: Pugliese 3/9/06 Tr. at 97-98.)

60.     In any event, Pugliese admits that her suggested accommodation of an Escort position in Westchester or Rockland Counties was not a permanent solution and that "as a final resolution, the best case scenario would have been an inside position." (Ex. 2: Pugliese 10/12/06 Tr. at 58.)

E.      Pugliese Was Placed Into Verizon's Health
        Impairment Evaluation Process.

61.     If MetLife determines that an indefinitely or permanently disabled employee cannot perform the essential functions of her position but may be able to perform some other job,

Verizon attempts to accommodate the employee's disability through what is known as the Health Impairment Evaluation or "HIC Process."   (Iazzetti Decl. ¶ 13.)

62.     The HIC Process is designed to accommodate employees whose health impairments prevent them from performing their job. (Ex. 14 (HIC § 1.1) at VZN 0243; Ex. 6: Lehane Tr. at 7.)

63.     Under the HIC Process, Verizon first attempts to locate a vacant position within the employee's department to which the employee may be transferred.  If no vacancy exists within the employee's department, the employee is encouraged to search for a suitable internal position by reviewing the weekly published list of vacant positions in the geographic area (called "Specific Published Vacancies" or "SPVs") and to apply for any position for which the employee believes he or she is qualified. (Iazzetti Decl. ¶ 14; Ex. 14 (HIC § 2.2) at VZN 0243.)

64.     Employees using the HIC Process are given priority for vacant positions, second only to "surplus" employees, or employees whose job class is designated overpopulated by Verizon.  Surplus employees are prioritized for open positions under the terms of Verizon's collective bargaining agreement.  (Iazzetti Decl. ¶ 15.)

65.     If an employee within the HIC Process does not locate another position within 90 days, then the employee either returns to her original position, if medically possible, or continues to collect short term disability benefits.  After 52 weeks of short term disability, such an employee is eligible to apply for long term disability benefits.  (Iazzetti Decl. ¶ 16.)

66.     Under the terms of the long term disability policy, a person receiving long term disability benefits automatically ceases to be an employee. (Iazzetti Decl. ¶ 17; Ex. 14 (HIC § 5.3(d)) at VZN 0246.)

67.     When Pugliese refused the Escort position in the Bronx, Verizon initiated a 90-day period during which Verizon and Pugliese conducted a job search for suitable, vacant positions within Verizon that would meet Pugliese's medical restrictions. (Iazzetti Decl. ¶ 22; Ex. 14 (HIC §§ 4.2-4.3) at VZN 0244-45; Ex. 15 at 0011-12.)

68.     Specifically, Pugliese was informed that she should actively look for an indoor position by reviewing Verizon's job listings (called "specific published vacancies" or SPVs) and applying for open positions. (Iazzetti Decl. ¶ 22; Ex. 20.)

69.     Members of Verizon's human resources department also notified Pugliese when they became aware of open positions (Iazzetti Decl. ¶ 23; Ex. 21.)

70.     On January 13, 2004, Eric Olson, a manager at Verizon, informed Pugliese of an indoor administrative assistant position in Valhalla, New York and told her to apply for it. (Iazzetti Decl. ¶ 24; Ex. 21.)

71.     Pugliese applied for the administrative assistant position. (Iazzetti Decl. ¶ 24; Ex. 1: Pugliese 3/9/06 Tr. at 235.) The position was withdrawn, however, and never filled for reasons unrelated to Pugliese. (Declaration of Diana L. Purser ¶ 3.)

72.     Pugliese did not apply for another position at Verizon during the 90-day period. (Iazzetti Decl. ¶ 25.)

73. The 90-day job search period for Pugliese to conduct a job search pursuant to the HIC Process expired in February 2004. (Iazzetti Decl. ¶ 26; Ex. 22.)

74. Pugliese presented no further evidence of available positions at Verizon that met her demands or that she even cooperated with Verizon by applying for other suitable positions. (Ex. 1: Pugliese 3/9/06 Tr. at 247-48, 269.)

75. Pugliese admits that she did not know of any open customer service positions at Verizon from 2002 through 2005. (Ex. 1: Pugliese 3/9/06 Tr. at 269.)

76. After 52 weeks on short term disability, Pugliese applied to MetLife for long term disability, and MetLife determined that Pugliese qualified effective April 7, 2004. (Ex. 17 at VZN 0309; Ex. 23 at 0174.)

77. Under the terms of the long term disability policy, a person receiving long term disability benefits automatically ceases being an employee. (Iazzetti Decl. ¶ 17.) Accordingly, Pugliese was removed from Verizon's payroll when she began receiving long term disability from MetLife. (Iazzetti Decl. ¶ 27; Ex. 14 (HIC § 5.3(d)) at VZN0246.)

F.    Pugliese Admits She Is Not Disabled.

78.    On June 28, 2006, MetLife discontinued Pugliese's long-term disability benefits. The decision was based on the conclusion that Pugliese does "not meet the definition of disability" because she is currently employed and has "the capacity to perform other occupations for pay or profit". (Ex. 24, p. 2.)

79.    MetLife's decision was based in part on Dr. Paras's representations that Pugliese "is no longer disabled." (Ex. 25.)

80.    Pugliese's symptoms vary in intensity and duration over time and depend on the level of her medications and external stimuli. (Ex. 26: Paras Tr. at 134; Ex. 1: Pugliese 3/9/06 Tr. at 191.) Indeed, since she left Verizon and was divorced from her husband, Pugliese's condition has improved to the point that she reduced her visits to Dr. Paras and stopped taking psychiatric medications. (Ex. 1: Pugliese 3/9/06 Tr. at 191-92; Ex. 27: Thomas Tr. at 51.)

81.    According to Pugliese's psychiatrist, Pugliese's alleged post traumatic stress disorder is "almost completely in remission" and Pugliese is "no longer disabled." (Ex. 25; Ex. 26: Paras Tr. at 83.)

82.    While on long-term disability, Pugliese frequently spent her days at Dube's Dollar Depot, a retail store in Nanuet, to help her friend, Jodi Thomas, the owner of the store. (Ex. 2: Pugliese 10/12/06 Tr. at 27-28; Ex. 27: Thomas Tr. at 25.) Pugliese did the same things as Dube's Dollar Depot's payrolled employees, including stocking shelves, operating the register, and cleaning. (Ex. 27: Thomas Tr. at 32.)

83.     Pugliese is a licensed real estate agent and has been affiliated with a real estate office, ERA Tucker Associates, since 2001.  (Ex. 1:  Pugliese 3/9/06 Tr. at 241-43; Ex. 28 at 00093.)

84.     Pugliese has been operating a child care facility in her home in September 2006.  (Ex. 2:  Pugliese 10/12/06 Tr. at 33.)

85.     Pugliese admits that she is able to work:  "I'm not disabled . . . . I can work.  I have never said that I couldn't work."  (Ex. 2:  Pugliese 10/12/06 Tr. at 42-43.)

G.  Pugliese Cannot Show That Verizon Terminated
    Her In Retaliation For Filing An EEOC Charge.

86.     On April 2, 2003, Pugliese filed a charge of discrimination with the New York Division of Human Rights and the EEOC.  (Ex. 29 at VZN 0229-32; Ex. 1:  Pugliese 3/9/06 Tr. at 269-70.)  At Pugliese's request, the EEOC terminated its processing of the charge and issued Pugliese a Notice of Right to Sue on January 21, 2005  (Ex. 3:  Compl., Ex. 1.)

87.     Pugliese admits that her claim for retaliation is "just a suspicion" and based only on a conversation with Clarence Williams in which he was aware of the EEOC charge and "he said something about some legal mumbo jumbo."  (Ex. 1:  Pugliese 3/9/06 Tr. at 270-71.)

H.  <u>Pugliese Admits There Is No Basis For Punitive Damages</u>.

88.  Pugliese admits there are no facts on which she is aware that Verizon discriminated against her willfully.  (Ex. 1:  Pugliese 3/9/06 Tr. at 282.)

          Respectfully submitted,
          TORYS LLP

          By: /s/ Charles E. Dorkey III
            Charles E. Dorkey III (CD 8422)
            Christopher M. Caparelli (CC 8374)
            237 Park Avenue
            New York, New York 10017-3142
            (212) 880-6000

          Attorneys for Defendant

6985938.10

## **CERTIFICATE OF SERVICE**

I certify, under penalty of perjury, that, on January 12, 2007, I caused the foregoing DEFENDANT'S RULE 56.1 STATEMENT OF UNDISPUTED FACTS to be served by first-class mail and electronic mail upon the following counsel for plaintiff:

Glenn B. Allyn, Esq. (GBA 9537)
Allyn, Hausner & Montanile LLP
399 Knollwood Road, Suite 114
White Plains, New York 10603


/s/ Christopher M. Caparelli
Christopher M. Caparelli