UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VANESSA M. PUGLIESE,

                                    Plaintiff,

          -v-                                          Case No. 05-CV-4005 (KMK)

                                                       OPINION AND ORDER
VERIZON NEW YORK, INC., AND/OR VERIZON,

                                    Defendant.

Appearances:

Glenn B. Allyn, Esq.
Allyn, Hausner & Montanile, LLP
White Plains, New York
*Counsel for Plaintiff*

Charles E. Dorkey, III, Esq.
Christopher Michael Caparelli, Esq.
Torys LLP
New York, New York
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        On April 20, 2005, Plaintiff Vanessa Pugliese filed this employment discrimination

action against Defendant Verizon New York ("Verizon").[1]  The Complaint alleges that

Defendant discriminated against Plaintiff on the basis of her mental illness, and unlawfully

retaliated against her, in violation of the Americans with Disabilities Act of 1990 ("ADA") and

---

[1]Plaintiff has initiated this action against "Verizon New York, Inc., and/or Verizon."  For
the purposes of this Opinion and Order, the Court will use the word "Defendant" in singular
form, as the parties sued by Plaintiff are all essentially the same entity – Verizon.

the New York State Human Rights Law ("NYSHRL").[2]  Defendant has filed a Motion for

Summary Judgment and a Motion to Strike material in Plaintiff's affidavits responding to the

Motion for Summary Judgment.  For the reasons stated below, Defendant's Motion to Strike is

GRANTED in part and DENIED in part, and Defendant's Motion for Summary Judgment is

DENIED.

## I.  Factual Background

Plaintiff Vanessa Pugliese was 31 years old when this case was commenced.  (Pl.'s Dep.

15; Def.'s Rule 56.1 Statement of Undisputed Facts ("Def.'s 56.1") ¶ 1; Pl.'s Opp. to Def.'s Rule

56 Mot. to Dismiss ("Pl.'s 56.1 Response") ¶ 1.)  Plaintiff was hired as a field technician by

NYNEX in August 1997.  (Def.'s 56.1 ¶ 3; Pl.'s 56.1 Response ¶ 3.)  Plaintiff subsequently

performed the same job for Verizon, NYNEX's successor.  (Def.'s 56.1 ¶¶ 2-3; Pl.'s 56.1

Response ¶¶ 2-3.)

Shortly after hire, Plaintiff commenced a six-month training course in the functions of a

field technician.  (Def.'s 56.1 ¶ 6; Pl.'s 56.1 Response ¶ 6.)  These functions included the

following tasks:  repairing wiring and associated items of equipment at customer premises;

working indoors and outdoors; climbing ladders and poles; working aloft for long periods of

time using tools and test equipment; interacting with customers to ensure customer satisfaction;

---

[2]A claim of disability discrimination under the New York State Human Rights Law, N.Y. Exec. Law §§ 290-301 (McKinney 2008), is governed by the same legal standards as federal ADA claims.  *See Graves v. Finch Pruyn & Co., Inc.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006) (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 332 n.1 (2d Cir. 2000)).  Thus, to the extent that Plaintiff brings a state-law disability-discrimination claim, it survives or fails on the same basis as her ADA claim.

Plaintiff's Complaint also contains a claim under the New York City Human Rights Law ("NYCHRL").  N.Y. City Admin. Code § 8-107.  Plaintiff has since abandoned this claim.  (Pl.'s Mem. of Law in Supp. of her Opp. to the Moving Def.'s Rule 56 Motion 75.)

checking work to ensure compliance with customer needs; and completion of a signed daily time record.  (Def.'s 56.1 ¶ 5; Pl.'s 56.1 Response ¶ 5.)  Plaintiff understood that these tasks were essential to the proper performance of her job.  (Def.'s 56.1 ¶ 6; Pl.'s 56.1 Response ¶ 6.)

Plaintiff officially began work as a field technician in October 1997.  (Def.'s 56.1 ¶ 8; Pl.'s 56.1 Response ¶ 8.)  Throughout her tenure, Plaintiff normally worked a shift from 7:30 a.m. to 4:30 p.m.  (Def.'s 56.1 ¶ 9; Pl.'s 56.1 Response ¶ 9.)  She usually was based out of Verizon's facility located in Elmsford, New York; it was there that she reported each morning, picked up her truck, and received her work assignments for the day.  (Def.'s 56.1 ¶¶ 8, 12; Pl.'s 56.1 Response ¶¶ 8, 12.)

Each day, Plaintiff typically received three work assignments, which she understood were intended to take her entire shift to complete.  (Def.'s 56.1 ¶ 13; Pl.'s 56.1 Response ¶ 13.)  Plaintiff, however, tended to hurry through her assignments and would often complete them by noon.  (Def.'s 56.1 ¶ 14; Pl.'s 56.1 Response ¶ 14.)  Plaintiff knew that if she completed her morning assignments before the end of the day, she was obligated to call the dispatch unit to obtain additional assignments.  (Def.'s 56.1 ¶ 16; Pl.'s 56.1 Response ¶ 16.)   On numerous occasions, however, Plaintiff did not comply with these requirements.  (Def.'s 56.1 ¶ 11; Pl.'s 56.1 Response ¶ 11; Pl.'s Dep. 43-45.)   Rather than calling in for extra assignments, Plaintiff would go to an empty garage and "hang out" until the end of her shift, linger in her truck, or go home and do her laundry.  (Def.'s 56.1 ¶¶ 11, 16, 18, 26, 30, 32, 34, 35, 36, 38; Pl.'s 56.1 Response ¶¶ 11, 16, 18, 26, 30, 32, 34, 35, 36, 38.)  On these occasions, Plaintiff would inaccurately fill out her daily time sheet so as to disguise her true activities.  (Def.'s 56.1 ¶¶ 39-40; Pl.'s 56.1 Response ¶¶ 39-40.)  Such behavior violated the Verizon Code of Business

Conduct.  (Def.'s 56.1 ¶¶ 20-22, 41; Pl.'s 56.1 Response ¶¶ 20-22, 41.)[3]

In early March 2003, Plaintiff told her supervisor, Lou Delbene, that she did not "feel safe" performing her job on her own and that she needed a companion.  (Def.'s 56.1 ¶ 42; Pl.'s 56.1 Response ¶ 42.)  Starting on approximately March 4, 2003, Delbene agreed to let Plaintiff work with another Verizon field technician.  (Def.'s 56.1 ¶ 43; Pl.'s 56.1 Response ¶ 43.)  Later that month, Clarence Williams became Plaintiff's supervisor, and he too "did what he could" to provide Plaintiff with a companion.  (Def.'s 56.1 ¶ 47; Pl.'s 56.1 Response ¶ 47; Pl.'s Dep. 83.)  Defendant characterizes this accommodation as a temporary measure.  According to Defendant, all field technicians in Westchester and Rockland County work alone, except on special occasions that require multiple workers, or if the worker needs temporary assistance for medical needs unrelated to the job task.  (Def.'s 56.1 ¶ 7.)  Defendant had, in the past, given temporary accommodations similar to those given to Plaintiff to other individuals with short-term physical or mental impairments. (Def.'s 56.1 ¶ 44.)  According to Defendant, Delbene told Plaintiff that her accommodation was a temporary allowance and that she would be required to work alone in the future.  (Def.'s 56.1 ¶ 43.)  Plaintiff concedes that she was never told she held the position of "escort" – an employee who accompanies a field technician on his or her daily rounds – and acknowledged that she was not aware of any employee in Westchester who held such a position. (Def.'s 56.1 ¶ 45; Pl.'s 56.1 Response ¶ 45.)  According to Defendant, Verizon employs permanent escorts only in certain portions of New York City, and not in any of the counties

---

[3]According to Plaintiff, various employees of Verizon were aware of Plaintiff's tendency to avoid work in the afternoons.  Defendant only became "officially" aware of this behavior during Plaintiff's March 9, 2006 deposition.  (Def.'s Mem. of Law in Supp. of its Mot. for Summ. J. ("Def.'s Br.") 22-23.)

north of New York City.  (Def.'s 56.1 ¶ 58; Def.'s Ex. 19.)[4]

On March 25, 2003, after approximately three weeks of working with a companion, Williams told Plaintiff that she could no longer ride with another person unless her job required the assistance.  (Def.'s 56.1 ¶ 48; Pl.'s 56.1 Response ¶ 48.)   Following her conversation with Williams, Plaintiff was absent from work from March 26, 2003, to March 31, 2003.  (Def.'s 56.1 ¶ 49; Pl.'s 56.1 Response ¶ 49.)

On or about March 31, 2003, Plaintiff returned to work and presented Williams with a note from Dr. Carol Paras.  (Def.'s 56.1 ¶ 50; Pl.'s 56.1 Response ¶ 50.)  The note stated that because of Plaintiff's "post-traumatic stress disorder (delayed)," she "can no longer work outside, alone" and will "have to be moved inside as soon as possible."  (Def.'s 56.1 ¶ 50; Pl.'s 56.1 Response ¶ 50.)  Dr. Paras also suggested that, as an alternative to going on full-time disability, Defendant could try sending Plaintiff out to work with a companion.  (Def.'s 56.1 ¶ 50; Pl.'s 56.1 Response ¶ 50.)[5]  According to Plaintiff, however, such an accommodation could not be a permanent solution – a long-term solution would require Plaintiff to be moved indoors.  (Def.'s 56.1 ¶ 60; Pl.'s 56.1 Response ¶ 60.)

Once presented with Dr. Paras's note, Williams determined that Plaintiff could no longer

---

[4]In her response to Defendant's Motion for Summary Judgment, Plaintiff offers Exhibit N, a list purporting to show occasions where more than one worker performed field technician duties within the County of Westchester.  For the reasons discussed below regarding Defendant's Motion to Strike, Exhibit N is inadmissible hearsay and will not be considered by the Court in deciding Defendant's Summary Judgment Motion.

[5]Dr. Paras later added that Plaintiff should work "indoors preferably with other women," and that Plaintiff needed a job that didn't involve "working in highly visible positions," such as high on a telephone pole or aloft in a bucket of a field technician's truck; "being in people's homes;" "being alone;" or "having physical contact with the public."  (Def.'s 56.1 ¶ 51; Pl.'s 56.1 Response ¶ 51.)

perform the essential tasks of a field technician and sent Plaintiff home.  (Def.'s 56.1 ¶ 52; Pl.'s 56.1 Response ¶ 52.)  According to Plaintiff, she was sent home without pay.  (Pl.'s Dep. 159, 166.)  Plaintiff alleges in her Complaint and Affidavit – but not her deposition – that she told Williams during this conversation that his conduct was discriminatory.  (Compl. ¶ 12; Pl.'s Aff. ¶ 5.)  Plaintiff considered herself terminated and subsequently applied for unemployment benefits.[6]

On April 2, 2003, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  Shortly thereafter, Williams apparently learned that Plaintiff had filed the EEOC charge.  (Pl.'s Rule 56.1 Statement of Material Facts ("Pl.'s  56.1") ¶ 16; Def.'s Rule 56.1 Counter-Statement to Pl.'s Material Facts ("Def.'s 56.1 Response") ¶ 16.)[7]

Defendant has an established policy and procedure for attempting to accommodate employees with disabilities.  (Def.'s 56.1 ¶ 54; Pl.'s 56.1 Response ¶ 54.)  According to

---

[6]Shortly after she was sent home, Plaintiff applied for unemployment benefits.  On February 3, 2004, Plaintiff's application was rejected by the New York State Department of Labor, which determined that Plaintiff was "totally disabled and not capable of work" and therefore ineligible to receive unemployment benefits effective May 19, 2003.  (Pl.'s Ex. K, Bates No. 42.)  On July 8, 2004, this decision was overruled by an Administrative Law Judge, Stanley Levine.  (Pl.'s Ex. K, Bates No. 65.)  Noting that "the facts of this case are uncontroverted and not in dispute," ALJ Levine held that Plaintiff was "capable of working at alternative positions that were less stressful, especially those in an office environment such as sales, administrative, and secretarial positions."  *Id.*  Plaintiff then received a number of back checks covering the period covering her benefits dispute.  (Pl.'s Ex. K, Bates Nos. 74-92 (showing checks issued by the New York State Department of Labor dating from June 1, 2003, to September 8, 2003, and then from December 21, 2003, to February 24, 2004, all issued on July 13, 2004, about a week after she won her appeal).)

[7]Plaintiff recorded various phone calls with employees of Verizon and Met Life, including several with Williams.  In one such undated phone conversation – all of the conversations are undated – Williams appears to say that he knows about her EEOC complaint, referring to "the legal m[u]mbo jumbo that you initiated."  (Pl.'s Ex. J, Bates No. 23.)  This presumably refers to the EEOC complaint, though this is far from certain.

Defendant, the first step in this process is a referral to its disability administrator, Metropolitan

Life Insurance Company ("MetLife").  (Def.'s 56.1 ¶ 55.)  On March 8, 2003, MetLife approved

Plaintiff for short-term disability benefits beginning on April 2, 2003, making her eligible for

thirteen weeks of full pay and thirty-nine weeks of half-pay.  (Def.'s 56.1 ¶ 57; Pl.'s 56.1

Response ¶ 57; Def.'s Ex. 16.)  During the time that Plaintiff received short-term disability

benefits, Plaintiff remained on Defendant's payroll and continued to receive pay stubs.  (Def.'s

56.1 ¶ 57; Pl.'s 56.1 Response ¶ 57.)

        In September 2003, roughly six months after being sent home by Williams, Defendant

offered to accommodate Plaintiff by allowing her to transfer to an escort position in the Bronx.

(Def.'s 56.1 ¶ 58; Pl.'s 56.1 Response ¶ 58.)  Although the Parties disagree over whether

Defendant properly followed-up on Plaintiff's counsel's inquiries regarding this offer (Def.'s

56.1 ¶ 58; Pl.'s 56.1 Response ¶ 58; Allyn Aff. ¶¶ 5-7), such disagreement is largely irrelevant:

Plaintiff testified that she rejected this offer because she considered it to be too dangerous, not

because of any miscommunication between Defendant and Plaintiff's counsel.  (Pl.'s 56.1

Response ¶ 59; Pl.'s Dep. 96-98.)  Regardless, Plaintiff admitted in her deposition that she would

not have accepted an escort position – even in Westchester County – as an adequate permanent

solution to her disability, and that the best case scenario would be for her to be placed in a

position permitting indoor work.  (Def.'s 56.1 ¶ 60; Pl.'s 56.1 Response ¶ 60.)  Her medical

needs, as described by Dr. Paras, made clear that Plaintiff needed an indoor job, and that an

escort-type position could only serve as a temporary accommodation.  (Def.'s 56.1 ¶ 60; Pl.'s

56.1 Response ¶ 60.)

        According to Defendant, after Plaintiff rejected the escort position in the Bronx, Plaintiff

was placed in Verizon's Health Impairment Evaluation Process ("HIC Process").  (Def.'s 56.1 ¶

67.)  The HIC process is meant to "outline the courses of action for the placement or

accommodation" of "employees who develop long-term or permanent impairments which

prevent them from performing the essential duties of their job."  (Pl.'s Ex. 14 at § 2.1 (HIC

Process).)  The course of action dictated by the policy is as follows.  Initially, the department

explores possible reasonable accommodations.  (*Id.* at § 2.2.)  If a reasonable accommodation

cannot be made, the department looks into whether the employee can be moved laterally to an

appropriate position.  (*Id.*)  If no lateral vacancies are available in the geographic unit of the

employee's area for which the employee is qualified and medically approved, a move to a lower

position will be considered.  (*Id.*)  If no job match is made within a three-month search, the case

is submitted for review by the Health Impairment Committee.  (*Id.* at § 4.3.)  According to

Defendant, during this three-month period, Plaintiff is encouraged to review the weekly

published list of internal vacancies ("Specific Published Vacancies" or "SPVs") for suitable

positions.  (Def.'s 56.1 ¶¶ 63, 65, 67-68.)  If, following the three-month period, the Committee

determines that all steps of the HIC process have been followed and all placement efforts have

been thoroughly documented, but no suitable job was found for the employee, the Committee

will refer the employee to receive appropriate disability benefits.  (Pl's Ex. 14 at §§ 5.21 -

5.31(c).)  After fifty-two weeks of disability benefits, the employee is then removed from the

active payroll and granted any benefits to which he/she is entitled, such as long-term disability.

(*Id.* at § 5.31(d).)

        Between March 31, 2003, the date that Plaintiff was "sent home," and April 7, 2004, the

date Plaintiff was approved for long-term disability, Defendant identified two possible

accommodations for Plaintiff.  The first position was the aforementioned escort position in the

Bronx, which Plaintiff rejected as too dangerous and insufficiently temporary.  The second

position, information about which was conveyed to Plaintiff by Eric Olsen, a manager at

Verizon, was an indoor administrative assistant position in Valhalla, New York.  (Def.'s 56.1 ¶

70; Pl.'s 56.1 Response ¶ 70.)  This offer was subsequently withdrawn, however, for reasons

unrelated to Plaintiff.  (Def.'s 56.1 ¶ 71; Pl.'s 56.1 Response ¶ 71.)  The administrative assistant

position was the only position Plaintiff applied for – no other positions were identified by

Defendant, and Plaintiff did not recall finding any positions that met her requirements during the

three-month search period.  (Def.'s 56.1 ¶¶ 72, 74-75; Pl.'s 56.1 Response ¶¶ 72, 74-75.)  In

addition, Plaintiff did not take advantage of the vocational rehabilitation services offered by

Defendant, imagining that they would be "humiliating."  (Pl.'s Dep. 232.)

     After fifty-two weeks on short-term disability, Plaintiff applied for long-term disability

and was accepted effective April 7, 2004.  (Def.'s 56.1 ¶ 76; Pl.'s 56.1 Response ¶ 76.)

Accordingly, Plaintiff was removed from Verizon's payrolls and ceased being a Verizon

employee.  (Def.'s 56.1 ¶ 77; Pl.'s 56.1 Response ¶ 77.)

     On June 28, 2006, MetLife discontinued Plaintiff's long-term disability benefits after

MetLife determined that Plaintiff was substantively employed and had the capability to remain

employed.  (Def.'s 56.1 ¶¶ 78, 82-84; Pl.'s 56.1 Response ¶¶ 78, 82-84.)  This decision was

based in part on representations by Dr. Paras that Plaintiff's post-traumatic stress disorder was in

remission and that Plaintiff was "no longer disabled."  (Def.'s 56.1 ¶¶ 79, 81; Pl.'s 56.1

Response ¶¶ 79, 81.)

## II. Discussion

### A.  Motion to Strike Evidence

#### 1.  Standard of Review

Because "a decision on the motion to strike may affect [the movant's] ability to prevail on summary judgment," it is appropriate to consider a motion to strike prior to a motion for summary judgment.  *Gucci Am., Inc. v. Ashley Reed Trading, Inc.*, No. 00-CV-6041, 2003 WL 22327162, at *2 (S.D.N.Y. Oct. 10, 2003); *see also Century Pacific, Inc., v. Hilton Hotels, Corp.*, 528 F. Supp. 2d 206, 213-14 (S.D.N.Y. 2007).  Federal Rule of Civil Procedure 56(e) requires that, in a summary judgment motion, "a supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."  Therefore, "[a] court may 'strike portions of an affidavit that are not based upon the affiant's personal knowledge, contain inadmissible hearsay or make generalized and conclusory statements.'"  *Rockport Co. v. Deer Stags, Inc.*, 65 F. Supp. 2d 189, 191 (S.D.N.Y. 1999) (quoting *Hollander v. Am. Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999)); *see also Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (holding that inadmissible statements in affidavits submitted in support of summary judgment motion are incapable of raising material issues of fact).  Defendant has moved to strike portions of several affidavits and exhibits submitted with Plaintiff's response Defendant's motion.  The Court will consider each in turn.

##### a.  Affidavit of Vanessa Pugliese

###### i.  Paragraph Eight and Exhibit N

Paragraph Eight of Plaintiff's Affidavit states:  "Exhibit N, attached to my opposition

papers[,] is a true and accurate account of other employees working two[-]man shifts in

Westchester.  In fact, the Ferris Ave. locations, the Fisher Ave. locations, the DeKalb Ave.

locations, the Lexington Ave. locations, are dangerous area[s] in Westchester which typically

require a two[-]man crew."  (Pl.'s Aff. ¶ 8.)  Defendant argues that Paragraph Eight and Exhibit

N should be stricken as inadmissible opinion and hearsay because they are based on information

of which Plaintiff does not have personal knowledge.

     Exhibit N is a log compiled by Plaintiff listing occasions when multiple technicians

allegedly were dispatched to a given work site.  The log features six data categories for each

entry:  the name of first technician, the name of second technician, the employee code, the

address of the repair site, the order/ticket number, and the date the work was done.  The log has

numerous potential problems.  First, the log is substantially incomplete:  many entries lack

information – such as dates, addresses, or names of the second technician and the length of time

the two technicians worked together – and the information that is included is often incomplete.

Second, and more importantly, Plaintiff's deposition casts doubt on the source of the information

included in the log.  Only one of the entries pre-dates her termination from Verizon; thus,

Plaintiff clearly gathered this information second-hand.  To the extent Plaintiff identifies the

source of this information, Plaintiff acknowledges that at least some of the data was provided by

Anthony Pugliese, her ex-husband.  (Pl.'s Dep. at 111-12.)

     Federal Rule of Civil Procedure 56(e) requires a summary judgment affidavit to be made

on personal knowledge.  Because the Court cannot determine what portions, if any, of Exhibit N

are based on personal knowledge, and what portions are the result of second-hand information,

Exhibit N is not admissible and will not be considered by the Court.  *See Sellers v. M.C. Floor*

*Crafters, Inc*., 842 F.2d 639, 643 (2d Cir. 1988) ("Because there is no way to ascertain which portions of [counsel's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment.").  Accordingly, Exhibit N and Paragraph Eight of Plaintiff's Affidavit are stricken.

### ii.  Paragraph Five

Paragraph Five of the Plaintiff's Affidavit states:  "On March 31, 2003, I advised my supervisor Mr. Williams that I need an accommodation, that [] defendant was not providing me with a reasonable accommodation, and that such conduct was discriminatory." (Pl.'s Aff. ¶ 5.) Defendant argues that Paragraph Five should be stricken because it raises new allegations and contradicts previous deposition testimony given by Plaintiff.  *See Perkins v. Mem'l Sloane-Kettering Cancer Ctr.,* No. 02-CV-6493, 2005 WL 2453078, at *15 (S.D.N.Y. Sept. 30, 2005) ("The Second Circuit has repeatedly stated that 'a party's affidavit which contradicts his own prior deposition testimony should be disregarded on a motion for summary judgment.'" (quoting *Buttry v. Gen. Signal Corp*., 68 F.3d 1488, 1493 (2d Cir. 1995)).

Paragraph Five largely reiterates the allegations in the Complaint.  Plaintiff's Complaint states that "[o]n or about March 31, 2003, and after requesting a reasonable accommodation because of her disability, and complaining of discriminatory treatment, Plaintiff was sent home." (Compl. ¶ 12.)  The Complaint further adds that Plaintiff's termination was "an act of retaliation for Plaintiff's requesting a reasonable accommodation in her employment because of her disability, and/or because of her complaints of discriminatory treatment."  (*Id*. ¶ 13.)   Paragraph Five is thus consistent with Paragraphs Twelve and Thirteen of the Complaint.

Because Paragraph Five does not raise any new allegations, the Court declines to strike it

from Plaintiff's Affidavit.  However, the Court observes that Paragraph Five is substantially at

odds with the portion of Plaintiff's deposition testimony in which she specifically stated her

belief that her retaliatory discharge was exclusively motivated by the filing of her EEOC

complaint.  (Pl.'s Dep. 269-72.)  Although the Court will not strike Paragraph Five, "factual

issues created solely by an affidavit crafted to oppose a summary judgment motion are not

'genuine' issues for trial."  *Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996);

*see also United Magazine Co. v. Murdoch Magazines Distribution, Inc.*, 393 F. Supp. 2d 199,

211 (S.D.N.Y. 2005) ("[A] self-serving affidavit that merely reiterates conclusory allegations in

affidavit form is insufficient to preclude summary judgment . . . .").

### b.  Affidavit of Glenn Allyn

#### i.  Paragraphs Three through Seven

Paragraphs Three through Seven concern communications between Plaintiff's attorney

Glenn Allyn and Defendant regarding Defendant's offer of employment in the Bronx.  The Court

declines to strike these paragraphs.  According to the Affidavit, Allyn has personal knowledge of

the events in question.  Although these allegations may turn out to be immaterial – it is unclear

from Plaintiff's deposition how much she knew about Allyn's communications with Defendant –

the Court need not strike this material before its full relevance is brought to light.   Moreover,

while Allyn's testimony may differ from Plaintiff's testimony, it does not contradict Plaintiff's

deposition testimony, which merely states that Plaintiff eventually rejected the offer due to

perceived dangerousness.

#### ii.  Paragraphs Nine through Fifteen

Paragraphs Nine through Fifteen of the Allyn Affidavit essentially describe the testimony

of Matthew Lehane.  This testimony is hearsay and is therefore stricken.

### iii.  Paragraph Sixteen

Paragraph Sixteen states:  "The defendant has not produced any documents evidencing HIC committee notes as required by the HIC policy.  Or any specific detail of what was done for plaintiff under HIC here."  (Allyn Aff. ¶ 16.)  The Court declines to strike this paragraph. Counsel could have argued this point in its response brief – Defendant is hardly prejudiced by being notified of this argument via affidavit rather than via Plaintiff's briefing.   Accordingly, Paragraph Sixteen will not be stricken, although it has no bearing on the outcome of Defendant's Summary Judgment Motion.

### c.  Plaintiff's Exhibit J

Plaintiff's Exhibit J consists of transcripts of various recordings of telephone calls made and received by Plaintiff.  Defendant argues that these transcripts are inadmissible because they have not been properly authenticated.

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  *See also United States v. Tin Yat Chin*, 371 F.3d 31, 37 (2d Cir. 2004) (citing rule).  "Rule 901 does not erect a particularly high hurdle, and the proponent of the evidence is not required to rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be."  *United States v. Dhinsa,* 243 F.3d 635, 658 (2d Cir. 2001) (internal citation and quotation marks omitted).  The requirement under Rule 901 is satisfied "'if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity

or identification.'"  *Id.* (quoting *United States v. Ruggiero*, 928 F.2d 1289, 1303 (2d Cir. 1991)).

Although Rule 901(a) does not definitively establish the nature or quantum of proof that is required to establish the authenticity of a telephone conversation, subsection (b) provides illustrations of what will suffice.  Subsection (b)(5), dealing specifically with voice identification, states that "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording" can be established "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker."  Fed. R. Evid. 901(b)(5).  "A telephone conversation is admissible in evidence if the identity of the speaker is satisfactorily established and the question is for the jury if, as reasonable [people], they could find the claimed identification to be accurate."  *See United States v. Albergo*, 539 F.2d 860, 863-64 (2d Cir. 1976) (internal citations omitted).  "While a mere assertion of identity by a person talking on the telephone is not in itself sufficient to authenticate that person's identity, some additional evidence, which 'need not fall in[to] any set pattern,' may provide the necessary foundation."  *United States v. Khan*, 53 F.3d 507, 516 (2d Cir. 1995) (quoting Fed. R. Evid. 901(b)(6) advisory committee's note, Example 6); *see also Dhinsa,* 243 F.3d at 659.  Transcripts of such recordings must be authenticated in the same manner as the tape recordings themselves.

*See United States v. Anderson*, 452 F.3d 66, 77 (1st Cir. 2006) ("'[W]hen transcripts are offered for use, either as evidence or a jury aid, they should be authenticated in the same manner as tape recordings that are offered in evidence'" (quoting *United States v. Carbone*, 798 F.2d 21, 26 (1st Cir. 1986))), *quoted in United States v. Rommy*, 506 F.3d 108, 137 (2d Cir. 2007).

Here, Plaintiff has provided Defendant with tapes of the audio conversations in question,

an index of the conversations contained on the tapes, transcripts of the conversations, and an affidavit from Marion Rosley of Marion J. Rosley Secretarial, Transcription and Translation Services testifying to the accuracy of the transcripts.  Moreover, Plaintiff states in her deposition testimony that she personally recorded the tapes that were handed over to Defendant.  (Pl.'s Dep. 164-165; Pl.'s Second Dep. 50-54.)  Accordingly, because a reasonable jury could find the claimed identifications to be accurate, the transcripts are admissible.

      B.  Defendant's Motion for Summary Judgment

          1.  Standard of Review

Summary judgment may be granted when it is shown that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor.  *See Tufariello v. Long Island R.R.*, 458 F.3d 80, 85 (2d Cir. 2006).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, at *9 (S.D.N.Y. Mar. 26, 2008).  "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor."  *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995).  "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'"  *Id*. (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (alteration in original)); *see also McPherson v. N.Y.*

*City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."); *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) ("[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." (internal quotation marks omitted)).

The materiality of the facts considered by the Court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial.  *See Castro v. Metro. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006); *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.,* 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990).  A court's goal should be to "isolate and dispose of factually unsupported claims."  *Celotex*, 477 U.S. at 323-24; *see also Brant v. County of Dutchess*, No. 05-CV-10590, 2008 WL 418379, at *3 (S.D.N.Y. Feb. 11, 2008) (same).

While courts are to be "particularly cautious" about granting summary judgment to employers in cases where the discriminatory intent of the employer is contested, *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997), "[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases," *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  And, although district courts must pay careful attention to affidavits and depositions which may reveal circumstantial proof of discrimination, *see Gallo v. Prudential Residential Servs., Ltd.*, 22 F.3d 1219, 1224 (2d Cir. 1994), courts are not to "'treat discrimination differently from other ultimate questions of fact.'" *Abdu-Brisson*, 239 F.3d at 466 (quoting *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S.

133, 148 (2000)); *see also Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir.

2006) (noting the caution with which the Second Circuit reviews the grant of summary judgment

in discrimination cases "because direct evidence of discriminatory intent is rare and such intent

often must be inferred from circumstantial evidence found in affidavits and depositions[,]" but

stating that "summary judgment remains available for the dismissal of discrimination claims in

cases lacking genuine issues of material fact" (internal quotation marks omitted)).

### 2. Claims under the ADA

Claims brought under the ADA are subject to the burden-shifting test set forth by the

Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see Sista v. CDC

IXIS N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).[8]  Under this burden-shifting framework, a

plaintiff must first establish a prima facie case of discrimination.  *See Reg'l Econ. Cmty. Action

Program, Inc. v. United States*, 294 F.3d 35, 49 (2d Cir. 2002) (hereinafter *RECAP*).  If the

plaintiff is able to establish a prima facie case of disability discrimination, a presumption of

discrimination arises.  *See Evans-Gadsden v. Bernstein Litowitz Berger & Grossman, LLP*, 491

F. Supp. 2d 386, 395 (S.D.N.Y. 2007).  At that point, the burden of production (but not

persuasion) shifts to the defendant "to provide a legitimate, nondiscriminatory reason for [its]

decision."  *RECAP*, 455 F.3d at 49 (citing *Reeves*, 530 U.S. at 142 and *Heyman v. Queens Vill.

Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d. Cir.

1999)).  A defendant's burden in this regard is not very significant; indeed, a defendant need not

---

[8]The ADA provides: "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

prove that it was actually motivated by these legitimate reasons.  *See Deravin v. Kerik*, No. 00-CV-7487, 2007 WL 1029895, at *6 (S.D.N.Y. Apr. 2, 2007) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  If the defendant makes a satisfactory showing, the presumption of discrimination disappears and the burden shifts back to the plaintiff.  *See id.* at *6.  The plaintiff must then "prove that the defendant[] intentionally discriminated against [him or her] on a prohibited ground."  *RECAP*, 294 F.3d at 49.  In other words, the plaintiff must show that defendant's "articulated, legitimate, non-discriminatory reasons were pretextual."  *Id.* (internal quotation marks omitted); *see also Deravin*, 2007 WL 1029895, at *6 ("The plaintiff 'may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" (quoting *Burdine*, 450 U.S. at 255)).

### a. Reasonable Accommodation Claim

In a reasonable accommodation claim, in order to establish a prima facie case, a plaintiff must show:  "(1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of [her] disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations."  *Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004).[9]  Defendant does not dispute that Plaintiff has satisfied the second element, as Defendant clearly had notice of Plaintiff's alleged disability.  Therefore,

---

[9]Under the ADA the term "discriminate" includes "denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant."  42 U.S.C. § 12112(b)(5)(B).

at issue in this Motion are the other three elements of Plaintiff's prima facie case:  whether

Plaintiff had a disability within the meaning of the ADA; whether Plaintiff could have performed

her job with reasonable accommodations; and whether the employer refused to make such

accommodations.  Accordingly, the Court will address each element in turn.

i.  Plaintiff was Disabled Within the Meaning of the ADA

The ADA defines a "disability" as:

> (A) a physical or mental impairment that substantially limits one or
> more of the major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).  The existence of a disability must be determined on a "case-by-case"

basis.  *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002).  Not every

impairment suffered by a plaintiff qualifies as a "disability" within the meaning of the ADA.  *See*

*id.* at 195.  For an impairment to qualify as a disability, there are two requirements:  the

impairment must limit a major life activity and the limitation must be substantial.  *See* 42 U.S.C.

§ 12102(2)(A).

"'[M]ajor life activities' are 'activities that are of central importance to daily life."

*Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005) (quoting *Toyota*, 534 U.S. at

197).  The EEOC regulations define "major life activities" to include "functions such as caring

for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning,

and working."  29 C.F.R. § 1630.2(i); *see also EEOC v. J.B. Hunt Transp., Inc.*, 321 F.3d 69, 74

(2d Cir. 2003).

EEOC regulations define the term "substantially limits" to mean:

> (i) Unable to perform a major life activity that the average person

20

in the general population can perform; or
(ii) Significantly restricted as to the condition, manner or duration
under which an individual can perform a particular major life
activity as compared to the condition, manner or duration under
which the average person in the general population can perform
that same major life activity.

29 C.F.R. § 1630.2(j)(1). Thus, "[f]actors to consider in determining whether a major life

activity is substantially limited include: the nature and severity of the impairment; its duration or

expected duration; and the existence of any actual or expected permanent or long term impact."

*Capobianco*, 422 F.3d at 57 (citing 29 C.F.R. § 1630.2(j)(2)); *see also Toyota*, 534 U.S. at

196-97 ("'[S]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a

large degree,'" and "thus clearly precludes impairments that interfere in only a minor way with

the performance of manual tasks from qualifying as disabilities." (alteration in original)). "[T]he

mere fact that an impairment requires an individual to perform a task differently from the

average person does not mean that she is disabled within the meaning of the ADA; rather, there

must be a significant restriction." *Capobianco*, 422 F.3d at 57. "The inquiry is not just on the

effect an impairment has on tasks associated with a specific job, but it must focus primarily on

whether the claimant is 'unable to perform the variety of tasks central to most people's daily

lives.'" *Id*. (quoting *Toyota*, 534 U.S. at 200).

Here, Plaintiff argues that she was substantially limited in the major life activity of

working.[10] "The ability to work is substantially limited (among other indicia) if the plaintiff is

'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in

various classes as compared to the average person having comparable training, skills and

---

[10]Plaintiff does not identify any other major life activities that she was substantially
impaired from performing at the relevant time.

21

abilities.'"  *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir. 1998) (quoting 29

C.F.R. § 1630.2(j)(3)(i)).  However, "[t]he regulations make clear that 'the inability to perform

in a single, particular job does not constitute a substantial limitation in the major life activity of

working.'"  *Id*. (quoting 29 C.F.R. § 1630.2(j)(3)(i)).  Drawing all inferences in favor of the

Plaintiff, the evidence put forward by the Parties demonstrates that Plaintiff was incapable of

working as a field technician by herself, but that she was capable of serving as a secretary or

administrative assistant.  Accordingly, because Plaintiff was capable of performing productive

work other than her field technician role, Plaintiff did not suffer from a physical or mental

impairment that substantially limited one or more of her major life activities, and thus fails to

satisfy the first statutory definition of "disability" within the ADA.  *See Davis v. Oyster

Bay-East*, No. 03-CV-1372, 2006 WL 657038, at *6-7 (E.D.N.Y. Mar. 9, 2006) (holding that

plaintiff's post-traumatic stress disorder precluded plaintiff, at most, from performing a single,

particular job); *Dean v. Westchester County P.R.C.*, 309 F. Supp. 2d 587, 594-95 (S.D.N.Y.

2004) (holding that plaintiff's depression, anxiety and post traumatic stress disorder precluded

plaintiff, at most, from performing a single, particular job).[11]

　　　　Although Plaintiff's condition did not substantially limit a major life activity, Plaintiff

still may be deemed disabled within the meaning of the ADA if she is "regarded" by her

---

[11]Defendant notes that Plaintiff has held several jobs since she was sent home by Verizon.
(Def.'s 56.1 ¶¶ 78-79, 81-85; Pl.'s 56.1 Response ¶¶ 78-79, 81-85; Def.'s Br. 6, 10-11.)
Plaintiff's employment during the intervening years, however, is not probative at this stage
because the Court's analysis of Plaintiff's discrimination and retaliation claims is limited to the
time period of the alleged misconduct of Defendant.  *See Peres v. Oceanside Union Free Sch.
Dist.*, No. 05-CV-1807, 2008 WL 305342, at *11 n.5 (E.D.N.Y. Jan. 31, 2008) (noting that
because evidence submitted by defendants was not limited to the place and time period at issue
in the case, it was irrelevant to the pending summary judgment motion).

employer "as having a physical or mental impairment that substantially limits a major life

activity."[12]  *Capobianco*, 422 F.3d at 56 (citing 42 U.S.C. § 12102(2)).  "[W]hether an individual

is 'regarded as' having a disability 'turns on the employer's perception of the employee' and is

therefore 'a question of intent, not whether the employee has a disability.'"  *Colwell*, 158 F.3d at

646 (quoting *Francis v. City of Meriden*, 129 F.3d 281, 284 (2d Cir. 1997)).  It is not enough that

the employer perceive the employee as "somehow disabled;" rather, the employer must regard

the employee as "disabled within the meaning of the ADA," that is, having an impairment that

substantially limits a major life activity.  *Id*. at 646 (emphasis omitted); *see also Jacques v.*

*DiMarzio, Inc*., 386 F.3d 192, 201 (2d Cir. 2004).

      Plaintiff argues that Defendant took the position that Plaintiff was "disabled within the

meaning of the ADA" by pointing to a "Notice of Determination to Claimant" issued by the New

York State Department of Labor ("NYSDOL").  (Pl.'s Ex. K, Bates No. 42.)  The Notice of

Determination to Claimant, dated February 3, 2004, states the following reasons for finding that

Plaintiff was "not capable of work:"

        You are collecting total disability from your employer Verizon due

---

[12]Defendant observes that Plaintiff's Complaint "does not plead a 'regarded as disabled'
claim."  (Def.'s Reply Mem. of Law in Further Supp. of its Mot. for Summ. J. ("Def.'s Reply")
3.)  The ADA defines a "disability" as:

        (A) a physical or mental impairment that substantially limits one or
        more of the major life activities of such individual;
        (B) a record of such an impairment; or
        (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).  The Court is unaware of any authority, and Defendant has provided no
authority, that would require Plaintiff to specify in her Complaint whether her claim is limited to
the statutory definition of disability in subsection (A) or whether her claim might also be
properly considered a "regarded as disabled" claim.  *Cf.* Fed. R. Civ. P. 8(a)(2) (stating that
complaint must contain "a short and plain statement of the claim showing that the pleader is
entitled to relief").

> to post-traumatic stress disorder.  Your employer was unable to
> accommodate your restrictions.  Because meaningful work can
> probably not be found within your restrictions[,] you are
> considered to be totally disabled and not capable of work.  To be
> eligible for unemployment benefits a claimant must be ready,
> willing, and able to work.

*Id.*  Plaintiff states that this finding by the NYSDOL is an admission that precludes Defendant

from arguing that Plaintiff was not "totally disabled."

There are several problems with Plaintiff's argument.  The document provided by

Plaintiff lays out findings of the NYSDOL, not specific admissions by Defendant.  To the extent

that the language quoted by Plaintiff characterizes the position held by Defendant, it merely

states that Defendant was unable to make the accommodation that Plaintiff requested –

presumably, a temporary escort-type position leading to a permanent indoor position.  But the

language quoted does not say that Defendant regarded Plaintiff's alleged disability as

substantially limiting a major life activity.  Quite simply, Plaintiff does not provide any record of

what Defendant did or did not argue at the NYSDOL hearing.  Moreover, the appeal of this

decision – which Plaintiff brought and won, thereby granting her unemployment back-benefits –

suggests that Defendant argued that Plaintiff was not fully disabled.  In particular, the opinion

issued by Administrative Law Judge Stanley Levine states that Plaintiff was "unable to continue

in her field position due to a partial disability caused by post-traumatic stress disorder," but that

Plaintiff was "capable of working at alternative positions that were less stressful, especially

those in an office environment, such as sales, administrative, and secretarial positions."  (Pl.'s

Ex. K, Bates No. 65.)  Significantly, the decision notes that the "facts of [Plaintiff's] case are

uncontroverted" and that appearances were made by Plaintiff, her attorney, and a representative

of Defendant.  (*Id.*)  Thus, to the extent that any inference can be gained from this appeal, it is

that Defendant represented to the Administrative Law Judge that Plaintiff was still capable of

meaningful work. Without more, the records of Plaintiff's unemployment benefits hearing and

appeal do not substantiate Plaintiff's claim that Defendant "regarded" Plaintiff as disabled within

the meaning of the ADA.[13]

Although the unemployment records do not show that Defendant regarded Plaintiff as

substantially limited in the major life activity of working, other evidence submitted by Plaintiff

does give rise to an issue of fact as to whether Defendant perceived Plaintiff to be disabled.

Plaintiff testified in her deposition that some time after she was sent home, she called Verizon's

Human Resources Department and requested an accommodation. (Pl.'s Dep. 104.) Plaintiff

then testified that she was told by Lawrence A. Iazzetti, a Human Resources Manager, that there

were no positions available for her and that her only option was to go on disability. (*Id*.) This

testimony, while perhaps self-serving, is based on Plaintiff's first-hand knowledge and is

arguably corroborated by the timeline of events in this case. Plaintiff notified her employer of

her potential disability on March 31, 2003. In so doing, Plaintiff informed Defendant that her

post-traumatic stress disorder prevented her from working outside, alone, in highly visible

---

[13]Plaintiff argues that "admissions" by Defendant evidenced by the records of Plaintiff's
unemployment benefits hearing and appeal warrant an invocation of the doctrine of judicial
estoppel. "The doctrine of judicial estoppel prevents a party from asserting a factual position in
one legal proceeding that is contrary to a position that it successfully advanced in another
proceeding." *Rodal*, 369 F.3d at 118. "Thus, '[a] party invoking judicial estoppel must show
that (1) the party against whom the estoppel is asserted took an inconsistent position in a prior
proceeding and (2) that position was adopted by the first tribunal in some manner, such as by
rendering a favorable judgment.'" *Id*. (quoting *Mitchell v. Washingtonville Cent. Sch. Dist*., 190
F.3d 1, 6 (2d Cir. 1999)). For the reasons discussed above, Plaintiff has not shown that
Defendant took an inconsistent position at either the unemployment benefits hearing or appeal.
Thus, the Court declines Plaintiff's invitation to estop Defendant from arguing that Plaintiff was
not disabled within the meaning of the ADA.

positions (such as high on a telephone pole or aloft in a field technician's bucket), in other people's homes, or in situations where she would have contact with the public.  (Def.'s 56.1 ¶¶ 50-51; Pl.'s 56.1 Response ¶¶ 50-51.)  After receiving this news, Defendant sent Plaintiff home, and then waited more than six months before referring her to its HIC process – the means by which Defendant explores potential accommodations for impaired employees.  (Def.'s 56.1 ¶¶ 52, 67; Pl.'s 56.1 Response ¶¶ 52, 67.)  This delay, while perhaps explainable, raises an issue of fact over whether Defendant perceived Plaintiff to be disabled.  Although there is evidence pointing in the opposite direction – for example, Defendant references a letter it sent to the New York State Department of Human Rights following Plaintiff's EEOC claim, in which it argued that Plaintiff was not disabled within the meaning of the ADA (Def.'s Ex. 15, Bates No. 12 ("Under the present facts it is clear that Pugliese's charge fails to state a claim under the ADA and N.Y. Exec. Laws.")) – the Court cannot say that a reasonable jury, hearing of Iazzetti's alleged statements and learning about Defendant's delay in attempting to accommodate Plaintiff, could not find that Defendant perceived Plaintiff to be disabled.  Accordingly, Plaintiff (barely) has satisfied the first element of her reasonable accommodation claim.

ii.  Plaintiff Could Perform the Essential Functions of the Job at
Issue With Reasonable Accommodation

The next contested element of Plaintiff's reasonable accommodation claim asks whether Plaintiff could perform the essential functions of the job at issue if given the benefit of a reasonable accommodation.  *See Graves*, 457 F.3d at 184.

"Courts have defined 'essential functions' to mean the affirmative duties or inherent parts of a job."  *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 287 (S.D.N.Y. 1999).  "To be qualified, the individual must satisfy the requisite skill, experience, education and other

26

job-related requirements of the employment position . . . ."  *Misek-Falkoff v. I.B.M. Corp*., 854 F.

Supp. 215, 226 (S.D.N.Y. 1994), *aff'd*, 60 F.3d 811 (2d Cir. 1995).  "It is well established that

the ADA does not protect plaintiffs who are unable to meet these requirements."  *Valentine,* 50

F. Supp. 2d at 287 (citing *Altman v. N.Y. City Health and Hosp. Corp.*, 100 F.3d 1054, 1061 (2d

Cir. 1996)).

 Plaintiff also "bears the burden of proving . . . that an accommodation exists that permits

her to perform the job's essential functions."  *Borkowski v. Valley Cent. Sch. Dist*., 63 F.3d 131,

138 (2d Cir. 1995).  However, "the employer may defeat the prima facie case . . . by

demonstrating that making the proposed accommodation would result in undue hardship."

*Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 99 (2d Cir. 1999) (citing *Mitchell,* 190 F.3d

at 6).  In resolving this question, the burden of persuasion falls on the employer.  *See Borkowski*,

63 F.3d at 138-39.

 In regard to Plaintiff's previous position of field technician, Plaintiff has failed to carry

her burden in demonstrating that she could have performed the essential functions of the job with

a reasonable accommodation.   According to Dr. Paras, Plaintiff's post-traumatic stress disorder

prevented Plaintiff from working outside by herself in highly visible positions (such as high on a

telephone pole or aloft in a field technician's bucket), in other people's homes, or in situations

where she would have contact with the public.  (Def.'s 56.1 ¶¶ 50-51; Pl.'s 56.1 Response ¶¶ 50-

51.)   In Dr. Paras's view, Plaintiff needed to be "moved inside as soon as possible" and should

work "indoors[,] preferably with other women."  (Def.'s 56.1 ¶¶ 50-51; Pl.'s 56.1 Response ¶¶

50-51.)  These restrictions clearly would have prevented Plaintiff from performing the essential

functions of her field technician job.  (Def.'s 56.1 ¶ 5; Pl.'s 56.1 Response ¶ 5 (noting that a field

technician was required to perform, inter alia, the following tasks:  repairing equipment at customer premises; working outdoors; climbing ladders and poles; working aloft for long periods of time; and interacting with customers to ensure customer satisfaction).)

Plaintiff argues – rather inconsistently – that she could have performed these essential tasks if given a companion – that is, if she could do her work as part of a two-person team.  It is undisputed that Verizon field technicians in Westchester do occasionally work in pairs.  (Def.'s Reply 4 n.5.)  And, it is undisputed that Plaintiff was accommodated in such a manner for approximately three weeks.  (Def.'s 56.1 ¶ 43; Pl.'s 56.1 Response ¶ 43; Pl.'s Dep. 83.)  Plaintiff and Dr. Paras both made it clear, however, that such an accommodation could only be a temporary solution, and that a long-term solution would require that Plaintiff be moved indoors and away from the public (Def.'s 56.1 ¶ 60; Pl.'s 56.1 Response ¶ 60) – restrictions that would negate the possibility of continuing in her capacity as a field technician, with or without a companion.

Even if Plaintiff was capable of continuing in her position as a field technician with the assistance of a permanent companion – a claim which is belied by the record – such an accommodation would be tantamount to removing the essential functions of the job.  The record demonstrates that Verizon does not provide technicians with permanent companion workers in Westchester County.  Verizon provides permanent companions only in certain areas of New York City, where safety considerations militate in favor of such arrangements.  (Def.'s 56.1 ¶ 58; Def.'s Ex. 19.)  Plaintiff's request that Verizon have another technician permanently accompany Plaintiff – regardless of whether a second person was necessary for the job or necessary for safety – essentially would require Verizon to hire two workers to perform the job of one.  Such

an accommodation, in addition to removing the essential functions of the job, would not be reasonable. "'Reasonable' is a relational term:  it evaluates the desirability of a particular accommodation according to the consequences that the accommodation will produce . . . [which] requires an inquiry not only into the benefits of the accommodation but into its costs as well." *Borkowski*, 63 F.3d at 138.  "In short, an accommodation is reasonable only if its costs are not clearly disproportionate to the benefits that it will produce."  *Id.*  Plaintiff's request – that Verizon send two employees to perform a job meant for one employee – fails this cost-benefit test.  *See Gilbert v. Frank*, 949 F.2d 637, 644 (2d Cir. 1991) (observing that a proposal by plaintiff that a second employee perform various essential functions of plaintiff's job would not be a reasonable accommodation as it would substantially reduce worker productivity).

Although Plaintiff could not perform the essential functions of her field technician job, "[t]he ADA [also] lists reassignment to an existing, vacant position as a possible reasonable accommodation." *See Graves*, 457 F.3d at 187.  "According to the EEOC guidelines, an employer who utilizes reassignment to meet the duty of reasonable accommodation for a current employee 'should reassign the individual to an equivalent position in terms of pay, status, etc., if the individual is qualified, and if the position is vacant within a reasonable amount of time.'" *Norville*, 196 F.3d at 99 (citing EEOC Interpretive Guidance on Title I of the ADA, 29 C.F.R. App. § 1630.2(o)).  Such accommodation, however, does not require the employer to create a new position for a disabled employee.  *See Graves*, 457 F.3d at 187.

The evidence in the record indicates that Plaintiff was capable of working in an administrative or secretarial capacity.  Such a position likely was not equivalent to her previous position of field technician.  *See Quintana v. Sound Distrib. Corp*., No. 95-CV-0309, 1997 WL

40866, at *6 (S.D.N.Y. Feb. 3, 1997) ("The interpretive guideline issued by the EEOC requires transfer only where an equivalent – similar – vacant position for which the employee is qualified exists."); *Christopher v. Laidlaw Transit Inc*., 899 F. Supp. 1224, 1227-28 (S.D.N.Y. 1995) ("Generally, an employer is not required to provide disabled employees with alternative employment when the employee is unable to meet the demands of his present position.  Rather, an employer is required merely to reasonably accommodate an employee's handicap so as to enable him to perform the functions of the position he currently holds." (internal citations omitted)).  However, while reasonable accommodation generally does not require an employer "to find another job for an employee who is not qualified for the job he or she was doing, [the employer] cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies."  *Sch. Bd. of Nassau County, Fla. v. Arline*, 480 U.S. 273, 289 n.19 (1987); *see also Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1035 (2d Cir. 1993) ("While reasonable accommodation generally does not require an employer to reassign a disabled employee to a different position, an employer may not deny an employee his or her contractual right to bid for reassignment by reason of a disability."); *see also Shea v. Tisch*, 870 F.2d 786, 790 (1st Cir. 1989) ("an employer is not required to find alternative employment unless he normally does so under his existing policies").  The facts in the record demonstrate that Verizon had an established policy for reassigning disabled employees to vacant positions that better fit their capabilities.  Thus, Plaintiff has satisfied her burden by demonstrating that alternate employment could have served as a reasonable accommodation.  Accordingly, Plaintiff has satisfied this element of the reasonable accommodation test.

### iii.  Defendant Refused to Make Reasonable Accommodations

The final contested element of Plaintiff's reasonable accommodation claim asks whether the employer refused to make a reasonable accommodation.  *See Graves*, 457 F.3d at 184.  Here, Plaintiff has raised a triable issue of fact.  As previously noted, Plaintiff testified that she was told by Lawrence A. Iazzetti, a Human Resources Manager, that there were no positions available for her and that her only option was to go on disability.  (Pl.'s Dep. 104.)  This testimony is corroborated by the timeline of events of this case in that Defendant waited more than six months after Plaintiff informed Defendant of her impairment before referring her to its HIC process.  In addition, during the year that Plaintiff was receiving some form of partial disability pay, Defendant identified only two potential accommodations for Plaintiff, of which only one met her long-term requirements (an indoor administrative or secretarial job) and that job offering disappeared before Plaintiff could be considered.  While there may be valid reasons why the accommodation process was so delayed and unfruitful, the circumstances call into question the efforts of Defendant, and thus raise a factual issue as to whether Defendant refused to accommodate her perceived disability.  Accordingly, Plaintiff has met her burden in this final element of the reasonable accommodation test.

### iv.  Conclusion of Reasonable Accommodation Claim

For the foregoing reasons, Plaintiff has established a prima facie case for her reasonable accommodation claim, and has satisfied her burden under *McDonnell Douglas* to demonstrate a contested issue of fact over Defendant's proffered explanation for the allegedly discriminatory treatment.  See *Deravin*, 2007 WL 1029895, at *6 (noting that a Plaintiff may satisfy its burden under *McDonnell Douglas* "'either directly by persuading the court that a discriminatory reason

more likely motivated the employer or indirectly by showing that the employer's proffered

explanation is unworthy of credence.'" (quoting *Burdine*, 450 U.S. at 255)); *see also Sista*, 445

F.3d at 173 (noting that evidence of pretext can be the same evidence produced with respect to

the plaintiff's prima facie case).  Accordingly, Defendant's Motion for Summary Judgment on

Plaintiff's reasonable accommodation claims is DENIED.[14]

### b.  Retaliation Claim

The ADA prohibits, inter alia, retaliation against any individual who has asserted rights

under the ADA:

> No person shall discriminate against any individual because such
> individual has opposed any act or practice made unlawful by this
> chapter or because such individual made a charge, testified,
> assisted, or participated in any manner in an investigation,
> proceeding, or hearing under this chapter.

42 U.S.C. § 12203.[15]   This provision is substantially similar to the retaliation prohibition in Title

VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-3(a) (1994) ("[i]t shall be an

unlawful employment practice for an employer to discriminate against any of his employees . . .

because [the employee] . . . has opposed any practice made an unlawful employment practice by"

Title VII).  Accordingly, courts apply the same framework in analyzing claims of retaliation

---

[14]The same result applies to Plaintiff's NYSHRL claim.  *See Graves*, 457 F.3d at 184 n.3
(noting that a claim of disability discrimination under the NYSHRL is governed by the same
legal standard as federal ADA claims).

[15]The viability of a retaliation claim does not rest on the viability of the underlying
discrimination claim.  "[A] plaintiff need not establish that the conduct he opposed was actually
a violation of the statute so long as he can establish that he possessed a good faith, reasonable
belief that the underlying challenged actions of the employer violated that law." *Sarno v.
Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999) (internal quotation
marks omitted).

under the ADA as in analyzing Title VII retaliation claims.  *See Sarno*, 183 F.3d at 159.

"'To establish a prima facie case of retaliation under the ADA, a plaintiff must establish that (1) the employee was engaged in an activity protected by the ADA, (2) the employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred, and (4) there existed a causal connection between the protected activity and the adverse employment action.'" *Weissman v. Dawn Joy Fashions, Inc.*, 214 F.3d 224, 234 (2d Cir. 2000) (quoting *Sarno*, 183 F.3d at 159).  In analyzing a plaintiff's prima facie case, the Court is to determine whether "'proferred admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive.'"  *See Deravin*, 2007 WL 1029895, at *8 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

If the prima facie case is established, a presumption of retaliation arises and the defendant must offer a legitimate, non-retaliatory reason for its decision.  *See id.*  Such a showing will shift the burden back to the plaintiff to demonstrate that the proffered reason is pretextual, and that "'retaliation was a substantial reason for the adverse employment action.'" *See id.* (quoting *Jute*, 420 F.3d at 173).

Defendant argues that it is entitled to summary judgment because there exists no genuine issue of material fact that could permit a reasonable jury to find that Plaintiff established her prima facie case of retaliation, and, alternatively, because Plaintiff cannot demonstrate that Defendant's explanation for the treatment alleged by Plaintiff was mere pretext for discriminatory intent.  In so doing, Defendant challenges each element of Plaintiff's claim:  that Plaintiff was engaged in an activity protected by the ADA; that Defendant was aware of Plaintiff's protected activity; that Plaintiff suffered an adverse employment action; and that a

33

causal connection exists between the adverse employment action and Plaintiff's protected

activity.  Accordingly, the Court will address each element in turn.

### i.  Plaintiff was Engaged in an Activity Protected by the ADA

The first element of Plaintiff's prima facie case requires Plaintiff to demonstrate that she

was engaged in an activity protected by the ADA.  In her Complaint, Plaintiff alleges three

protected activities:  her request for an accommodation; her complaints regarding Defendant's

failure to make the requested accommodation; and her complaint of discrimination.  Plaintiff

argues in her briefing that all three of these activities form the basis of her retaliation claim.

(Pl.'s Br. 64-65.)  In her deposition, however, Plaintiff stated that it was only the formal

complaint of discrimination – the EEOC charge – that forms the basis of her retaliation claim:

> D:    I would like you to tell me all the facts on which you base
>        your conclusion that your termination was retaliatory.
>
> P:    One of the recordings that I have is, there is a mention of
>        the EEOC complaint.
>
> D:    And what does it say?
>
> P:    It says Clarence Williams is asking me if I filed the
>        complaint and he said something about some legal mumbo
>        jumbo.
>
> D:    Anything else that leads you to believe that your
>        termination was retaliatory?
>
> P:    I believe it is because of the EEOC complaint.
>
> D:    Are there any other facts, other than what you just testified
>        to, on which you base your conclusion that your
>        termination was retaliatory?
>
> P:    No.

(Pl.'s Dep. 271-72.)  As noted above in the discussion of Defendant's Motion to Strike, Plaintiff

attempted to rectify this omission by submitting an affidavit expanding the scope of her

retaliation argument beyond the testimony of her deposition.  (Pl.'s Aff. ¶ 5.)  This is improper –

Plaintiff cannot create a contested issue of fact by submitting an affidavit that contradicts her

own deposition testimony.  *See Hayes v. N.Y. City Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir.

1996) ("[A] party may not create an issue of fact by submitting an affidavit in opposition to a

summary judgment motion that, by omission or addition, contradicts the affiant's previous

deposition testimony."); *see also United Magazine Co.*, 393 F. Supp. 2d at 211 ("[A] self-serving

affidavit that merely reiterates conclusory allegations in affidavit form is insufficient to preclude

summary judgment . . . .").  Accordingly, Plaintiff has satisfied her prima facie case, but only in

regard to her complaint of discrimination filed with the EEOC on April 2, 2003.

ii.  Defendant was Aware of Plaintiff's Protected Activity

The second element of Plaintiff's prima facie case requires Plaintiff to demonstrate that

Defendant was aware of Plaintiff's protected activity.  Here, Plaintiff presents as evidence a

transcript of a recorded telephone conversation between Plaintiff and Williams.  In this

conversation, which apparently took place shortly after Plaintiff was sent home by Defendant (it

is undated), Plaintiff calls Williams to ask why she is being classified as sick.  In response,

Williams says the following:

> CW:   I know you're not sick.  I know that but in light of the
> situation that you're in, I mean, such time as Aetna gave us
> the definitive answer, of what to code you as, like an office
> can be changed, okay.  I mean, I have to put you down as
> sick, because if we got an offer, you'd have to get paid.
> Otherwise, you're not.  That's the reason why I do that.
>
> P:    I just wanted to make sure you understood . . .
>
> CW:   I understand what you're saying.  You did not say you are

> sick, but I'm saying that this is what we're having to call
> you as sick.  If you're not able to come back to work by the
> (inaudible) this and that, this is all the legal mumbo jumbo
> that you initiated, if you ask me, you initiated in the past
> week.  Okay?  So, you have to have the definitive answers
> on that.  There isn't much time.

(Pl.'s Ex. J, Bates Nos. 22-23.)  Although it is far from certain what Williams meant when he

referred to "legal mumbo jumbo," it is a fair inference that he might be referring to the EEOC

complaint filed by Plaintiff on April 2, 2003.  This conclusion is corroborated by a second

recorded conversation with Williams, also undated, in which Williams asks Plaintiff:  "Did you

have anything with the Executive Department of the State Division of Human Resources?" and

confirms that he was aware of Plaintiff's activity.  (Pl.'s Ex. J, Bates No. 17.)  Accordingly,

Plaintiff has satisfied her burden under the prima facie test of establishing that Defendant was

aware of Plaintiff's protected activity.

> ### iii.  An Employment Action Adverse to Plaintiff Occurred and There Exists a Causal Connection Between the Adverse Employment Action and the Protected Activity

The third and fourth elements of Plaintiff's prima facie case require Plaintiff to

demonstrate that she suffered an adverse employment action and that a causal connection exists

between the protected activity and the adverse employment action.

Plaintiff argues that she suffered an adverse employment action on March 31, 2003, when

she was sent home without pay.  This event, however, pre-dates the protected activity that forms

the basis of Plaintiff's retaliation claim – the filing of her EEOC complaint on April 2, 2003.

Accordingly, the events of March 31 cannot be causally related to the protected activity.  *See*

*Evans-Gadsden*, 491 F. Supp. 2d at 397 (noting that a causal connection can be established

indirectly through temporal proximity by "'showing that the protected activity was closely

followed in time by the adverse [employment] action.'" (quoting *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001) (alteration in original)).

The question before the Court, therefore, is whether Plaintiff has suffered an adverse employment action *after* the filing of her EEOC complaint that is causally related to the filing of the EEOC complaint.  Here, as noted above in the discussion of Plaintiff's failure to accommodate claim, Plaintiff has raised an issue of fact in regard to whether Defendant made adequate efforts to reasonably accommodate Plaintiff's impairment.  *Cf. Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1937 (2d Cir. 1993) (noting that defendant had discriminated against plaintiff in denying to plaintiff process available to all employees).  And, because Plaintiff filed her EEOC complaint only two days after presenting Defendant with the note from Dr. Paras detailing the contours of her impairment, it is impossible for the Court to say that a reasonable jury could not conclude that Plaintiff's EEOC complaint was a contributing factor to Defendant's accommodation efforts, or lack thereof.  *See Holcomb v. Iona Coll.*, 521 F.3d 130, 142 (2d Cir. 2008) ("A plaintiff alleging that an employment decision was motivated both by legitimate and illegitimate reasons may establish that the 'impermissible factor was a motivating factor, without proving that the employer's proffered explanation was not some part of the employer's motivation.'" (quoting *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir. 1997)); *RECAP*, 294 F.3d at 54 (noting that the causation may be established by showing that "that a retaliatory motive played *a part* in the adverse employment action." (emphasis added)); *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) ("It is . . . now settled that a plaintiff in a Title VII action need not disprove a defendant's proffered rationale for its adverse actions in order to prevail.").

Accordingly, Plaintiff has satisfied the third and fourth elements of her prima facie case.

iv.  Conclusion of Retaliation Claim

For the foregoing reasons, Plaintiff has established a prima facie case for her retaliation claim, and has satisfied her burden under *McDonnell Douglas* of demonstrating a contested issue of fact over Defendant's proffered explanation for the allegedly retaliatory treatment.  *See Deravin*, 2007 WL 1029895, at *6 (noting that a Plaintiff may satisfy its burden under *McDonnell Douglas* "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" (quoting *Burdine*, 450 U.S. at 254)); *see also Sista*, 445 F.3d at 173 (noting that evidence of pretext can either be additional to or the same as the evidence produced with respect to the plaintiff's prima facie case).  Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's retaliation claim is DENIED.

3.  Damages

In her Prayer for Relief, Plaintiff states that she is entitled to punitive damages.  (Compl. 7.)  Defendant argues that Plaintiff has not alleged the sort of malicious or recklessly indifferent conduct that would warrant a punitive award, *see Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-30 (1999), and that any damages that Plaintiff does collect should be limited by the "after-acquired evidence rule," in light of Plaintiff's deposition testimony that she committed numerous acts that, if known to Verizon at the time, would have merited her termination, *see Greene v. Coach, Inc.*, 218 F. Supp. 2d 404, 413-14 (S.D.N.Y. 2002).  While Defendant marshals several strong arguments, the record is insufficiently developed for the Court to rule on the issue at this time.  Accordingly, the Court will take up the issue of damages if and when this case proceeds to

trial.

## III. Conclusion

For the reasons stated herein, Defendant's Motion to Strike is GRANTED in part and

DENIED in part, and Defendant's Motion for Summary Judgment is DENIED.  The Clerk of

Court is respectfully directed to terminate the pending motions. (Dkt. Nos. 34, 51.)


SO ORDERED.

Dated:          July  9  , 2008
                White Plains, New York

                                          KENNETH M. KARAS
                                          UNITED STATES DISTRICT JUDGE

Service List:

Glenn B. Allyn, Esq.
Allyn, Hausner & Montanile, LLP
75 South Broadway 4th Floor
White Plains, NY 10601
Email: gba@ahmlawllp.com
*Counsel for Plaintiff*

Charles E. Dorkey, III, Esq.
Christopher Michael Caparelli, Esq.
Torys LLP
237 Park Avenue
New York, NY 10017
Email: cdorkey@torys.com
Email: ccaparelli@torys.com
*Counsel for Defendant*